**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 04 2014, 11:09 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY ZOELLER**
Attorney General

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF T.S., C.S. and I.S.: | ) ) ) ) | |
| S.R., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A04-1307-JT-354 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner, | ) ) | |
| and | ) ) | |
| CHILD ADVOCATES, INC., | ) ) | |
| Co-Appellee (Guardian Ad Litem). | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1301-JT-3276
Cause No. 49D09-1301-JT-3277
Cause No. 49D09-1301-JT-3278

**February 4, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

S.R. (Mother) appeals the involuntary termination of her parental rights to T.S., C.S., and I.S. (collectively, the Children). Mother challenges the juvenile court's finding that termination was in the best interests of the Children.

We affirm.

Mother and J.S. (Father) are the biological parents of T.S., C.S., and I.S., who were born in 2002, 2006, and 2011, respectively.[1] On October 28, 2011, the Marion County Department of Child Services (DCS) filed a petition alleging the Children were children in need of services (CHINS) because I.S. tested positive for cocaine and opiates at birth. At that time, T.S. and C.S. were removed from Mother and Father's care, and I.S. was still in the hospital. On the same date, the juvenile court granted temporary wardship to the DCS and ordered T.S. and C.S. returned to Mother and Father's care, with I.S. to return to their care upon her release from the hospital. The placement was contingent upon Mother and Father's

---

[1] Father signed consents for the Children's adoptions and does not participate in this appeal. Accordingly, we will provide facts concerning Father only where necessary to address Mother's arguments.

participation in home-based counseling, substance abuse assessments, and random drug screens.

On January 4, 2012, the Children were found to be CHINS after Mother admitted that I.S. tested positive for cocaine and opiates and to using opiates throughout her pregnancy. The juvenile court continued the Children's in-home placement with Mother and Father at that time. A detention hearing was held on February 3, 2012, at which the DCS requested the removal of the Children due to Father's failure to participate in services and concerns about Mother's continued drug use and unsafe sleeping practices with I.S. The juvenile court took the request under advisement and ordered Father to vacate the home and for the Children to maintain their in-home placement with Mother.

At a February 8, 2012 dispositional hearing, the court maintained the Children's placement in Mother's care and ordered Mother to engage in services as set forth in a Parental Participation Order. Among other things, the order required Mother to maintain suitable housing and income adequate to support the Children, participate in home-based counseling, undergo a substance-abuse assessment and complete all treatment recommendations, complete a psychological evaluation and follow recommendations, refrain from using illegal drugs, and take prescription medications only as directed. On April 4, 2004, the Children were removed from Mother's care and placed with their maternal grandparents due in part to Mother's continued drug use.

A review hearing was held on August 22, 2012, at which it was noted that Mother was only making minimal progress in services and was not at that time participating in substance-

3

abuse treatment. Shortly after the Children were removed, Mother went to an inpatient drug treatment center in Florida, where she remained for thirty-five days. Mother found the treatment center on her own and did not inform Family Case Manager (FCM) Rebecca Barker of her plans before her departure. Instead, FCM Barker learned of Mother's whereabouts from the Children's paternal grandmother. Upon returning from Florida, FCM Barker referred Mother to intensive outpatient treatment (IOP). Mother began IOP, but she was discharged from treatment due to her failure to attend group sessions and drug screens.

A permanency hearing was held on November 21, 2012, at which the DCS reported that Mother continued to be inconsistent with services. The DCS reported that Mother had been kicked out of inpatient drug treatment after being involved in a physical altercation and that she admitted to using alcohol and opiates. Mother requested additional time to complete inpatient treatment and, over the DCS's objections, the juvenile court maintained the permanency plan of reunification.

The next permanency hearing was held on January 23, 2013. The DCS reported that Mother was still very inconsistent with services, had visited the Children only sporadically, admitted to ongoing opiate use, and had tested positive for unprescribed controlled substances. The DCS recommended changing the permanency plan to adoption and ceasing to offer services to Mother. Mother objected, noting that she had checked into a halfway house and re-engaged in home-based services. The juvenile court changed the permanency plan to adoption, but ordered all services to remain in place for Mother.

The DCS filed its petition to terminate Mother's parental rights on January 28, 2013. A review hearing was held on April 17, 2013, at which the DCS requested permission to stop offering services to Mother because she had been unsuccessfully discharged from services. The juvenile court granted the request and maintained the Children's placement with their maternal grandparents. An evidentiary hearing on the petition to terminate was held on June 17, 2013, and the juvenile court took the matter under advisement. On June 24, 2013, the juvenile court issued its order terminating Mother's parental rights. Mother now appeals. Additional facts will be provided where necessary.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

Here, the juvenile court made detailed findings in its order terminating Mother's parental rights to the Children. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment.

*Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among several other things, that termination is in the best interests of the child. Ind. Code Ann. § 31-35-2-4(b)(2)(C) (West, Westlaw through 2013 1st Reg. Sess. & 1st Reg. Technical Sess.). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current through 2013 1st Reg. Sess. & 1st Reg. Technical Sess.)).

Although Mother purports to challenge the juvenile court's conclusion that

termination was in the best interests of the Children, she devotes nearly all of her brief to disputing a few of the juvenile court's specific factual findings. First, she challenges the following finding: "A major concern is [Mother's] untreated mental health issues for which she self medicates. She feels miserable when she is not 'high'. She just stays in her residence's basement 'trying to keep it together' and hates it." *Appellant's Appendix* at 26. Mother first appears to dispute that her mental health issues were ever identified as a serious issue. According to Mother, the DCS emphasized her drug use, not her mental health status. Mother fails to note, however, that she was required to obtain a psychological evaluation pursuant to the Parental Participation Order, and Mother was seen by a psychiatrist and prescribed medication while obtaining substance abuse treatment at Gallahue Mental Health Services. Mother also received therapy at Gallahue. Thus, her mental health was always identified as an issue, and she received services intended to address her mental health problems. As for Mother's assertion that the main focus of services was always her substance abuse, not her mental health, we note that Sue Callahan, Mother's counselor at Gallahue, testified that if Mother could not stay off of opioids, she would never be able to manage her mental health problems regardless of what medications were prescribed for her.[2] Accordingly, an initial focus on Mother's substance abuse seems to be a reasonable approach under the circumstances.

---

[2] Mother claims that she "kept asking for counseling for her children, herself, and her mother, but that never happened." *Appellant's Brief* at 13. Mother's argument in this regard is contradicted by the evidence presented at the termination hearing. FCM Barker testified that Mother never asked for family counseling or additional mental health services or said there was a need DCS was not fulfilling. Thus, Mother's argument in this regard is merely a request to reweigh the evidence and judge the credibility of witnesses, which we will not do on appeal.

Mother also seems to challenge the juvenile court's findings that she is "miserable" when she is sober and that she just stays in the basement of her residence. The juvenile court's findings in this regard, however, were pulled directly from Mother's testimony. Mother stated, "when I'm sober, I'm miserable." *Transcript* at 12. Moreover, Mother testified that she is living with Father and the Children's paternal grandfather in the grandfather's house, and that she stays in the basement to stay away from everybody. She testified further that she is afraid to go out into the world and takes Benadryl and sleeping pills to try to force herself to sleep because she is "just miserable." *Id.* at 54. The juvenile court's finding in this regard is amply supported by the evidence.

Next, Mother challenges the juvenile court's finding that she "was seen by Dr. Cecil, a psychiatrist, while working with an addiction counselor at Gallahue Mental Health. [Mother] was diagnosed with Anxiety and Depression and mood stabilizers were prescribed. [Mother] was inconsistent in taking the medications." *Appellant's Appendix* at 26-27. Mother's precise objection to this finding is unclear. It appears that she disputes the juvenile court's characterization of the medications as mood stabilizers. Specifically, she cites to federal and state case law indicating that Neurontin was approved by the FDA as an anti-epileptic and Seroquel as an anti-psychotic.

We find a number of deficiencies in Mother's argument in this regard, not the least of which is that Mother herself testified that she was prescribed Neurontin to treat pain and as a mood stabilizer. In any event, the juvenile court's characterization of the medications as mood stabilizers was of no consequence to its ultimate decision to terminate Mother's

8

parental rights. It is clear to us that the court was simply taking note of the fact that Mother was prescribed medications to treat her mental health issues and did not take those medications consistently. To the extent Mother argues that she was prescribed the incorrect medications and suffered extreme side effects, her assertions are undermined by testimony presented at the termination hearing. Callahan testified that when Mother took her medications, she was calmer and could problem-solve and follow through with plans. Although Mother questioned the effectiveness of the drugs, tiredness was the only side effect she mentioned to Callahan.

Finally, Mother disputes the following finding: "Although attempts to help [Mother] to receive Wishard Advantage and possibly disability were made, [Mother] has just recently applied for Wishard Advantage." *Id.* at 27. Specifically, Mother argues that she applied for Wishard Advantage (which appears from the record to be some form of medical coverage) a month and a half prior to the termination hearing and without any assistance. In support of this argument, Mother cites to her own testimony that she learned about the program on her own by calling Medicaid and the Indiana HIP line. Mother's testimony is contradicted, however, by Callahan's testimony that Mother was repeatedly told about the program while being treated at Gallahue. Moreover, when asked whether Callahan had informed her about the program, Mother responded, "[s]he gave me lots of options. She told me to go to like the Wheeler Mission, and stuff like that, but I was still under DCS. And so I didn't think that I needed to go to that." *Transcript* at 192. Thus, even Mother seemed to acknowledge that Callahan told her about the program. While it appears that service providers did not fill out

9

Mother's application for her, it is clear that they recommended the program and instructed her on how to go about enrolling. Nevertheless, Mother failed to enroll until shortly before the termination hearing.

Having concluded that the individual findings Mother challenges were not clearly erroneous, we now consider whether the juvenile court's ultimate conclusion that termination was in the Children's best interests was supported by the evidence. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 2778 (Ind. Ct. App. 2013). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

At the termination hearing, Mother was unemployed and had no source of income, and she admitted that she was not currently able to care for the Children. Mother did not successfully complete her referrals for substance-abuse treatment, and she admitted to using opiates just a few months prior to the termination hearing. Additionally, Mother told Callahan that Father was her source of drugs, and Callahan opined that Mother would not be

10

able to stay in recovery if Father remained a part of her life; nevertheless, she continued to live with him at the time of the termination hearing. Mother and Father also have a history of domestic violence, but Mother never completed domestic violence education. Moreover, James Polly, the Children's home-based counselor, testified that T.S. and C.S. experienced a great deal of anxiety concerning these proceedings, and that prolonging them further would cause the Children to suffer more turmoil. Additionally, the Children were placed with their maternal grandparents, who provided a stable, structured, and supportive home and planned to adopt the Children. Chris Crowder, the Children's guardian ad litem, was not in favor of Mother's proposed plan to continue the Children's placement without terminating her parental rights because it would not provide the Children with the stability or permanency they needed.

Throughout the underlying CHINS case and the termination proceedings, which spanned more than a year and a half, Mother has insisted that all she needed was more time— more time to complete services, more time to get sober and treat her mental health issues, more time to obtain stable housing and adequate income. The juvenile court gave Mother the additional time she requested on more than one occasion, but by her own admission, she is still not ready to parent the Children. The Children cannot wait forever. They need permanency and stability now. The juvenile court's finding that termination was in the best interests of the Children was supported by the evidence.

Judgment affirmed.

KIRSCH, J., and BAILEY, J., concur.

11